UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID LUXTON,

               Plaintiff,

    v.

WASHINGTON STATE
DEPARTMENT OF VETERANS AFFAIRS,

               Defendant.

CASE NO. 3:23-cv-05238-DGE

ORDER ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 26) AND
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(DKT. NO. 31)

      This matter involves a myriad of federal and state law claims arising out of Plaintiff David Luxton's separation from the Washington State Department of Veteran Affairs (the "Department") for failure to comply with Washington's vaccine requirements for state employees.

      Present before the Court are Defendant's Motion for Summary Judgment (Dkt. No. 26) and Plaintiff's competing Motion for Partial Summary Judgment (Dkt. No. 31). Having considered the material submitted for and against these competing motions, the Court GRANTS the Department's motion for summary judgment as to Luxton's federal law claims, DENIES as

1  MOOT Luxton's motion for partial summary judgment, and DECLINES to exercise

2  supplemental jurisdiction over Luxton's remaining state law claims.  The Court also DENIES all

3  other pending motions as MOOT.

## I  BACKGROUND

### A.  The Department

6  The Department serves the veteran population in the State of Washington.  (Dkt. No. 30

7  at 2.)  It provides a wide variety of services to their constituents, including health services that

8  provide counseling and wellness programs.  (*Id.*)  Such programs include counseling, brain

9  injury and recovery programs, treatment of post-traumatic stress disorder (PTSD), suicide

10  prevention and support, military sexual treatment support, etc.  (*Id.*)  The Department contracts

11  with service providers throughout the State of Washington to provide counseling.  (*Id.* at 3.)  The

12  Department does not manage the contractors; however, it must ensure the contractors provide an

13  appropriate standard of care.  (*Id.*)  The Department does so by confirming the facilities are

14  accessible and the providers properly maintain medical records.  (*Id.* at 3–4.)  In addition, the

15  Department works directly with providers to ensure they are operating within Department

16  guidelines and furthering the mission of the Department.  (*Id.* at 4.)

17  The Department operates four veteran homes throughout the State of Washington.  (*Id.*)

18  The veteran homes provide 24-hour nursing care, medical care, pharmacy services, and end-of-

19  life care.  (*Id.*)  The Department also operates various transitional housing facilities for veterans

20  who are unhoused.  (*Id.*)  Many of the individuals housed in these facilities are highly vulnerable.

21  (*Id.*)  They suffer from substance abuse, illnesses like chronic obstructive pulmonary disorder

22  (COPD), traumatic brain injuries, military sexual trauma, and PTSD.  (*Id.*)  Further, some

23

24

individuals require long-term care and assisted living due to strokes, cancer, arthritis, and other ailments.  (*Id.* at 5.)

**B.  Luxton appointed as Director of Counseling and Wellness Service Programs**

On June 16, 2021, Luxton applied for the position of Director of Counseling and Wellness Programs.  (Dkt. No. 37 at 9.)  The Job Posting identified that the "current duty station for this position is located in Olympia," however telework was allowed under a temporary order, and that a person could work remotely until the order was lifted.  (Dkt. No. 37-1 at 2.)  The described duties contained in the Job Posting included "[s]erving as the Contract Administrator for all contracts in the Division and conducting clinical oversite of the licensed mental health professional contractors."  (*Id.* at 3.)  On July 26, 2021, Luxton interviewed for the position with Mary Forbes, who at the time she was the Department's Veteran Services Assistant Director. (Dkt. No. 37 at 10.)

By letter dated August 12, 2021, Luxton was appointed as Director starting September 1, 2021.  (Dkt. No. 30-4.)  He began his appointment on September 1 and received an email attaching, among other things, a Position Description of the Director's duties.  (Dkt. Nos. 37-1 at 15; 30 at 13.)  Luxton read the Position Description, signed, and returned it to the Department the next day.  (Dkt. Nos. 30 at 15; 30-5.)  The Position Description described the work the Director would perform, including the following:

- "The CWP Director is responsible for all personnel, contractors, and related funding of Counseling & Wellness Programs." (Dkt. No. 30-5 at 3.)

- "The CWP Director is the Contractor Administrator for all contracts in the CWP Division and conducts clinical oversite of the licensed mental health professional contractors."  (*Id.*)

- "The CWP Director is responsible for the recruitment and selection of the licensed providers which includes: . . . provider site visits, . . . disciplining, discharging, and replacement of providers."  (*Id.*)

- "Director manages a provider list and directs who is selected to provide outpatient PTSD treatment services." (*Id.*)

- "This position selects new providers and dismisses those who are not performing as required. Site visits are the primary way in which performance of the individual clinical contractor is assessed." (*Id.* at 4.)

- "Responsible for clinical supervision to 40 plus Licensed Mental Health Providers and their subcontractors in Washington States[.]" (*Id.*)

- "The position serves as the clinical supervisor of contracted mental health providers and has full decision-making authority in the management of the contract providers." (*Id.* at 5.)

The Position Description also identified that "[t]he potential impact of errors or consequences of errors involves the health and welfare of veterans and their families if mental health providers fail to meet the standards of providers' license requirements." (*Id.* at 4.) It further recognized "[t]here will be a lack of credibility from the public and from our veterans, Guards, Reservists and their family members if Counseling & Wellness Programs fail to meet standards and fail to serve our veterans and their family members." (*Id.* at 5.) The Position Description identified an "[a]bility to travel through the State" as one of the "**Special Requirements/Conditions of Employment**." (*Id.* at 6.) The working conditions were identified as an "[o]ffice setting" with "[u]p to 100% telework authorized based on WDVA mission requirements." (*Id.*)

On September 6, 2021, Luxton met with Forbes where they discussed the position and Forbes signed the Position Description. (Dkt. No. 37 at 15.)

**C. The impact of COVID-19 on the Department**

On February 29, 2020, Governor Jay Inslee issued Proclamation 20-05, proclaiming a state of emergency for the State of Washington due to the COVID-19 outbreak. (Dkt. No. 28 at 3.) At the time, the Department had not yet received guidance on how to prevent the spread of the virus. (*Id.*) Thus, the Department installed their own protective measures including

handwashing, hand sanitizing, and the use of masks.  (Dkt. Nos. 28 at 3, *see also* 30 at 7.)  The Department implemented social distancing requirements; however, this was not always possible due to the space in the facilities.  (Dkt. Nos. 28 at 3, *see also* 30 at 7.)  The Department required contractors to adhere to these guidelines, but the Department was unable to confirm whether the contractors were adhering to protocols.  (Dkt. Nos. 28 at 3, *see also* 30 at 7.)  Additionally, the Department tracked symptoms, took staff and resident temperatures, and tested employees.  (Dkt. Nos. 28 at 4, *see also* 30 at 7.)  "Despite all these measures being in place, they did not prevent the transmission of COVID to the vulnerable populations [] serve[d] (both in and outside of Veterans homes) and among department employees."  (Dkt. Nos. 28 at 4, *see also* 30 at 7.)  "By October 2021, 35 veterans in Department facilities died after contracting COVID."  (Dkt. No. 30 at 7.)  From 2020 through October 7, 2021, "a total of 189 staff test[ed] positive for COVID." (*Id*.)

On August 9, 2021, Governor Jay Inslee issued Proclamation 21-14 ("Proclamation"), which required state employees be fully vaccinated by October 18, 2021, to continue employment.  (Dkt. No. 30-1.)

**D. Luxton's religious accommodation request**

On August 30, 2021, the Department emailed all employees reminding them of the requirements of Proclamation 21-14.  (Dkt. No. 28-1.)  It also reminded employees to submit accommodation requests by the next day, close of business.  (*Id*. at 2.)  Luxton was unaware of this email because his employment did not commence until September 1, 2021.  (Dkt. No. 28 at 8.)

On September 14, 2021, Luxton learned his continued employment was contingent on being vaccinated as required by Proclamation 21-14.  (Dkt. No. 37 at 16.)  He requested

1  information about the process for submitting a religious accommodation request.  (Dkt. No. 32 at

2  3.)  The next day Luxton began a scheduled medical leave and was unavailable through

3  September 22, 2021.  (Dkt. No. 37 at 17.)  Upon returning on September 23, 2021, Luxton began

4  completing a religious exemption request.  (Dkt. No. 32 at 5.)

5        On September 28, 2021, the Department informed Luxton his religious exemption and

6  accommodation request was closed because he had not submitted a formal request.  (Dkt. No.

7  32-4.)  On October 1, 2021, Luxton faxed his religious accommodation request to the

8  Department.  (Dkt. No. 32 at 6.)

9        Luxton's request identified he was a faithful Roman Catholic and stated that "according

10  to Church tenets on conscience" he was unable to take the available Covid-19 vaccines because

11  the available vaccines were "developed from the retinal cells of an 18-week-old fetus aborted in

12  1985, in its production and manufacturing stages" or "used fetal cell lines (HEK293) harvested

13  from the bodies of aborted babies, in their testing stages."  (Dkt. No. 32-5 at 4.)  Citing to the

14  Vatican's Congregation for the Doctrine of the Faith (CDF) and the National Catholic Bioethics

15  Center (NCBC), Luxton identified that "the issue of conscience rights remains principal" in

16  deciding whether to vaccinate regardless of any debate among Church leaders.  (*Id.*)[1]

17

18

---

19  [1] The CDF's Note on the Morality of Using Some Anti-Covid-19 vaccines identifies that "when
ethically irreproachable Covid-19 vaccines are not available . . . , it is morally acceptable to
20  receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and
production process."  Luis F. Card. Ladaria, S.I. et al., *Note on the morality of using some anti-*
21  *Covid-19 vaccines*, Vatican (Dec. 21, 2020),
www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_not
22  a-vaccini-anticovid_en.html.  Notwithstanding, "practical reason makes evident that vaccination
is not, as a rule, a moral obligation and that, therefore, it must be voluntary."  (*Id.*)  Similarly, the
23  NCBC notes that "individuals must discern whether to be vaccinated or not in conscience and
without coercion."  *NCBC Statement on COVID-19 Vaccine Mandates*, The National Catholic
24  Bioethics Center (July 2, 2021), www.ncbcenter.org/ncbc-news/vaccinemandatestatement.

Luxton sought an exemption from the vaccine requirement, asserting that since beginning his position on September 1, 2021, he was "presently accomplishing all assigned and expected duties via telework." (*Id*. at 5.) Luxton asserted the Position Description stated the position was "100% eligible" for telework. (*Id*.) Luxton further identified that he had been "100% telework status since March of 2020 in [his] previous State of Washington positions as a director (a similar position)." (*Id*.) Luxton further asserted he "did not and will not need to meet in-person with clients, patients, or co-workers before, during, or after-work while the Governor's Emergency Order is in effect." (*Id*.)

**E. Department denies Luxton's accommodation request, but offers potential reassignment**

On October 5, 2021, the Department convened a "Review Panel" to review and consider Luxton's exemption and accommodation request. (Dkt. No. 30 at 15.) The Review Panel consisted of Human Resources Director Sara Conley, Human Resources Operation Manager Audrey Ulrich, and the Department's Director, David Puente. (*Id*. at 12.) The Review Panel "did not challenge [Luxton's] basis for his exemption" and otherwise approved it along with all other religious exemption requests received. (*Id*. at 16.)

In reviewing Luxton's accommodation request, the Review Panel considered Luxton's job duties, his Position Description, and "the overall context of his role and the populations he served." (*Id*.) From their perspective, Luxton was required to have "both direct and indirect contact with those the Department services, including [its] most vulnerable population. Direct contact included times when Dr. Luxton might be visiting a contracting facility and a veteran or family member (or both) might be present." (*Id*. at 17.) It also included the indirect contact through "visiting facilities or contractor locations, even where a veteran or other individual receiving services might not be present." (*Id*.) In the end, contact with contract facilities,

providers, and the population served by the Department was deemed an essential part of Luxton's position.  (*Id.* at 19) ("To remove these key functions would be to remove essential functions of his job.").

In denying Luxton's accommodation request, the Department considered "the significant risk to those we serve who have high-risk factors and other co-morbidities and could potentially suffer extreme illness or death if infected by COVID."  (Dkt. No. 28 at 13.)  From the Department's perspective, it could not "wait and hope that Dr. Luxton would not contract COVID and not spread the virus to our staff, veterans, residents, and clients."  (*Id.*)  The Department determined allowing Luxton to remain unvaccinated in his current position "created an undue hardship in the context of the Department's operations."  (*Id.*)

The Department informed Luxton it could not offer an accommodation for Luxton's position:

> **Accommodation Decision**
> After carefully reviewing your job classification, essential functions, and working environment, we have determined the only reasonable accommodation we can offer is the possibility of a reassignment. There are no other accommodations for your position available which sufficiently mitigate or eliminate the risk associated with having an unvaccinated employee performing the essential functions of your position.
>
> If you have additional information that supports your ability to be accommodated in your current position, please send that information to your Human Resource Consultant, Aschlee Drescher, Aschlee.Drescher@dva.wa.gov as soon as possible.

(Dkt. No. 30-9 at 2–3.[2])

Notwithstanding, the Department offered Luxton possible reassignment and provided specific instructions on how to apply for potential reassignment:

> **Reassignment Request**

---

[2] Note the Decision letter Luxton received identified that the Department's "Review Committee," and not a "Review Panel," considered the exemption and accommodation request. (*Id.* at 2.)

If you would like us to explore any available reassignment options, you must email your Human Resource Consultant, Aschlee Drescher, Aschlee.Drescher@dva.wa.gov, no later than 7 days from the date of this notice.

Please include a copy of your most up-to-date resume that describes your work experience, education, and skills. This information is necessary in order to determine reassignment options, if any are available.

As a statewide agency, all vacancies within the agency will be considered unless you request a limited geographical search. This information must be included in your reassignment request.

WDVA will make a good faith effort to find you a position through the reassignment process. Due to the limited number of such positions, we will consider reassignment requests when all completed requested materials are received. Please format your e-mail's subject line to include your employee number, last name, first name and "religious accommodation reassignment."

Example: EIN# 00000000 – Last name, First name – Religious Accommodation Reassignment

Reassignment options are limited to vacant, funded positions for which the employee seeking an accommodation meets the position's qualifications. In the reassignment process, we will not eliminate an essential function or duty of the potential job, create a new position, displace another employee, or offer you a promotion. While we will try to assign you to a position that is considered lateral to your current position; please understand that positions at a lower salary range and/or job class will be considered as well.

If you choose not to seek reassignment, or discuss other accommodation options, you are required to be fully vaccinated against COVID-19 no later than October 18, 2021 or you will be separated from employment under a non-disciplinary status. If you choose to proceed with vaccination, please provide a record of your vaccination status to your Human Resource Consultant by October 5, 2021.

(*Id*. at 3.)

**F. Luxton's response to accommodation denial**

Upon receiving the Department's October 5, 2021 accommodation denial, Luxton emailed Aschlee Drescher, the Human Resource Consultant.  (Dkt. No. 37 at 20.)  Luxton requested specific information about the procedures governing the "Review Committee," the

1    Committee members' names, when the Committee met, an explanation of his position's essential

2    functions and how they posed a risk to others in the workplace, and statistics regarding risks

3    Luxton posed to others.  (Dkt. No. 32-7 at 2.)

4         After Luxton emailed Drescher, Forbes contacted Luxton to inform him she would be

5    posting his position and "wanted to give [him] the courtesy of informing" his team before the

6    posting.  (Dkt. No. 37 at 21.)  When asked during his deposition what evidence Luxton could

7    identify to support his claim that he sought reassignment, Luxton testified he "asked

8    [Forbes] . . . if there's anything that she could do, including any accommodation, and it was

9    denied.  [Forbes] stated she had nothing to do with it, and it was settled."  (Dkt. No. 50-1 at 8.)

10   Luxton also spoke with Forbes' supervisor about whether there was anything the supervisor

11   could do as he desired to continue working for the Department.  (*Id*.)  Luxton offered no other

12   evidence of any reassignment request.  (*Id*. at 8–9.)

13        Luxton's declaration filed in support of his motion for partial summary judgment

14   confirmed this conversation with Forbes, but added that he also asked Forbes what she could do

15   regarding accommodation options, including reassignment options.  (*See* Dkt. No. 32 at 7) ("I

16   asked her what the process for RA review was and if there was anything else she could do

17   regarding RA (accommodation) options, including any reassignment options, and she told me

18   that the final decision had been made and that there was nothing she could do.").

19        Later, in Luxton's declaration in opposition to the Department's motion for summary

20   judgment, Luxton described his conversation with Forbes differently.  Luxton stated he asked "if

21   there was anything that could be done and specifically asked [Forbes] if [he] could be reassigned.

22   She advised . . . 'no'; the decision had already been made, and there was nothing she could do.'"

23   (Dkt. No. 37 at 21).  Later in this same declaration, Luxton modified the description of the

24

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) AND PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 31) - 10

conversation a little further: "I specifically asked COL Forbes about my reassignment options and how I could exercise them when I met with her on October 5, 202[1]." (*Id*. at 23.)

After his meeting with Forbes, Luxton went "up the chain of command" and spoke with Department Director Lourdes Alvarado-Ramos about his accommodation request. (*Id*. at 22.) The meeting ended with Alvarado-Ramos stating she would discuss Luxton's accommodation request with Puente. (*Id*.) During this meeting, Luxton did not discuss a reassignment request with Alvarado-Ramos. (*See id*.)

Luxton never submitted an updated resume to Drescher or otherwise asked Drescher about possible reassignment as instructed in the Department's October 5, 2021 letter. (Dkt. No. 50-1 at 9.) Accordingly, the Department issued a non-disciplinary separation effective October 18, 2021. (Dkt. Nos. 28 at 14; 30 at 19; 50-1 at 9.)

Luxton asserts he could have "performed the essential functions of [his] appointed WDVA position 100% remotely," noting that he was not required to personally enter any of [the Department's] Health Care Settings during the pandemic." (Dkt. No. 37 at 12.) Relying on the language in the Post Description that stated, "[u]p to 100% telework authorized," Luxton asserts traveling to inspect a provider's remote health care setting for compliance while "desirable," was "not absolutely necessary" during the pandemic. (*Id*. at 12–13.)

### G. Luxton's Experts

#### 1. Dr. Harvey A. Risch

Risch is a Professor Emeritus of Epidemiology at Yale School of Public Health. (Dkt. Nos. 36-1 at 2.) He opines "the Covid-19 pandemic should not have been managed by reliance on counts of infections or cases, but on counts of deaths, hospitalizations and serious long-term syndrome caused by the infection, and by serious health, economic, and psychological harms

caused by the policies and actions taken in response to the pandemic[.]" (*Id*. at 3.) This opinion is based on a 2023 non-peer-reviewed "opinion [article] in summary of other peer-reviewed articles" that opined Covid-19 infection mortality range was below 0.1% averaged across the age span." (*Id*. at 3, Dkt. No. 25-5 at 6–7.) Citing to 2022 and 2023 "meta-analysis of [2021] studies of reinfection risks," he also offered opinions on the effect of post-infection natural immunity as compared to vaccination immunity without prior infection; concluding that post-infection natural immunity was as or more effective than vaccination immunity. (*Id*. at 5–6.) Risch also opined that when Washington's vaccine mandate was being enforced in 2021, "appreciable risks of breakthrough infections were evident, making the vaccines substantially imperfect for the supposed role of reducing infection risk." (*Id*. at 11.)

Based on CDC data on vaccinated breakthrough infection cases from April 2021 to December 2021, Risch calculated a vaccination breakthrough rate of 4.3%.[3] (*Id.* at 9–10.) Risch then used data released on January 12, 2022 to identify a 98.79% vaccination rate among the 826 Department employees, which means, according to Risch, that 10 Department employees were unvaccinated and terminated. (*Id*. at 12.) Multiplying Risch's calculated 4.3% breakthrough rate by total vaccinated employees (816), Risch opined that 4.23% (35) of the Department's total employees (826) would have had breakthrough infections. (*Id*.) Therefore, because 35 vaccinated employees with presumed breakthrough infections is greater than 10 unvaccinated employees, even if all 10 unvaccinated employees "had gotten Covid-19 during the same time

---

[3] Dr. Risch calculated 4.3% by dividing the total vaccinated breakthrough cases by the total vaccinated population from April 2021 to December 2021; 5,988,636 divided by 139,768,554. (*Id*. at 9.) Note that of the 5,998,636 cumulative total of vaccinated cases, 3,922,843 were reported in October (436,764), November (517,878), and December (2,968,201) of 2021, which was after Luxton was separated from employment. (*Id*.) At the end of September 2021, the breakthrough vaccination rate would have been 1.64% (2,065,793 divided by 125,638,445). (*See id*.)

period, the total infection load among these [10] unvaccinated [employees] would have been less than the total infection load among the [35] vaccinated [employees]." (*Id.*)

Based on these figures, Risch opined "all assertions that the presence of vaccinated staff in non-accommodable positions would have reduced public and staff safety, are illogical, since breakthrough infections of the vaccinated staff . . . would have caused more public 'unsafety' than infections among the unvaccinated." (*Id.*)  Risch further opined:

> I would also note that my discussions about the risk from infection load as a totality among vaccinated employees and among unvaccinated employees applies equally at the in-person interaction level, as probabilities.  That is, a person coming in contact with a WDVA employee would be more likely to be exposed to a breakthrough infection in a vaccinated employee, than to an infection in a rare unvaccinated employee, had such employees just remained working in place in their usual jobs.

(*Id.* at 13.)  As a result, Risch concludes that "[b]ecause of the small number of the unvaccinated terminated staff, the cumulative hardship [related to Luxton maintaining his employment] would not have been *undue*." (*Id.* at 14.)

2.  Lisa Brock

Brock has worked in Human Resources (HR) Management since 1984 and submitted an expert report on implementing accommodation procedures.  (Dkt. No. 25-4.)  Brock identified a professional organization, the Society for Human Resource Management (SHRM), published an online resource titled, "How to Handle an Employer's Request for a Medical or Religious Accommodation to a Vaccine Requirement." (*Id.* at 3.)  This online resource outlines steps for processing exemption and accommodation requests.  (*Id.*)  Brock did not identify when SHRM published this online resource or whether the Department had knowledge of this online resource at the time Luxton was separated from the Department.  (*See id.*)

For each identified SHRM step, Brock provided a practical application, where she discussed the processes developed at her former employers such as Overlake Medical Center and

1   Clinics. (*Id.* at 4–10.) Brock then assessed whether the Department followed a similar process

2   in evaluating Luxton's religious accommodation request. (*Id.*) Brock concluded the Department

3   did not conform to best practices based on her experience in other health care settings. (*Id.*)

4   **H. Procedural Background**

5       On March 20, 2023, Luxton filed the present complaint alleging the following causes of

6   action:

7      1) breach of contract;

8      2) violation of Wash. Const. Art. I, Sec. 11 and the First Amendment of the United

9         States Constitution;

10      3) violation of the Washington Law Against Discrimination (WLAD) for perceived

11         physical disability and failure to accommodate religious belief;

12      4) violation of the WLAD "Disparate Impact – Religious Belief";

13      5) violation of the WLAD "Public Policy Against Religious Discrimination – Religious

14         Belief";

15      6) "Public Policy Tort Claim Against Religious Discrimination – Religious Belief";

16      7) "Violation of Right to be Free From Arbitrary and Capricious Action";

17      8) Violation of Wash. Const. Art. I, Sec. 7;

18      9) "Deprivation of Life, Liberty, or Property, Wash. Const. Art. I, Sec. 3";

19      10) "Violation of the Equal Protection Clause of the Wash. Const. Art. I, Sec. 3";

20      11) Wage theft; and

21      12) "Violation of the 'Takings Clause' of the US Const. Amend V; Wash. Const. Art. I,

22         Sec. 16";

23

24

13) Violation of Title II of Civil Rights Act for perceived physical disability and failure to accommodate religious belief.

(Dkt. No. 1 at 14–25.)

The Department moved for summary judgment on all claims.  (Dkt. No. 26.)  It also moved to exclude Luxton's proffered experts Lisa Brock and Dr. Harvey Risch.  (Dkt. No. 24.)  Luxton moved for partial summary judgment requesting the Court conclude he "established his prima facie case failure to accommodate claim under Title VII and WLAD."  (Dkt. No. 31.)  In its reply, the Department also moved to strike Luxton's declaration (Dkt. No. 37) in support of Luxton's response to the Department's motion for summary judgment.  (*See* Dkt. No. 49 at 1–2.)

## II        SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

1  *Lobby, Inc.*, 477 S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

2  *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

3        The determination of the existence of a material fact is often a close question.  The court

4  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

5  e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

6  *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

7  of the nonmoving party only when the facts specifically attested by that party contradict facts

8  specifically attested by the moving party.  The nonmoving party may not merely state that it will

9  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

10  to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

11  Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not

12  be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

13                        **III      DISCUSSION**

14  **A. Eleventh Amendment Bars Luxton's Federal Constitutional Claims**

15        The Department asserts Luxton's "[c]laims seeking redress for state actors' violations of

16  the federal constitution must be brought pursuant to 42 U.S.C. § 1983," and because the

17  Department is not a "person" for purposes of § 1983, Luxton's constitutional claims must be

18  dismissed.  (Dkt. No. 26 at 19.)  Luxton does not challenge the conclusion that the Department is

19  not a "person" for purposes of § 1983.  Instead, Luxton asserts § 1983 "is [not] the only method

20  for Plaintiff to enforce his rights under the U.S. Constitution" because in "the public employment

21  context, Title VII now allows Plaintiffs to assert Free Exercise and equal protection claims

22  directly against the State and its agency."  (Dkt. No. 38 at 22–23.)

23

24

The Court agrees with the Department. "A litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983." *Azul-Pacifico, Inc. v. City of Los Angeles*, 972 F.2d 704, 705 (9th Cir. 1992). "States or governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes are not 'persons' under [42 U.S.C.] § 1983." *Doe v. Lawrence Livermore Nat'l Lab'y*, 131 F.3d 836, 839 (9th Cir. 1997) (quoting *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 70 (1989)); *Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022). Thus, the Eleventh Amendment bars claims for damages against the Department for alleged constitutional violations.

Luxton is correct that Title VII "allowed public employees to assert monetary claims against the state and its agencies without asserting claims under 42 U.S.C. § 1983." (Dkt. No. 38 at 23.) This is precisely why the Eleventh Amendment does not bar Luxton's Title VII claim. The decisions Luxton cites (*id*. at 23–24) confirm "Section 5 of the Fourteenth Amendment empowers Congress to 'enforce, by appropriate legislation the provisions of' that article, and state sovereign immunity may be abrogated in service of this goal." *Alaska v. EEOO*, 564 F.3d 1062, 1067 (9th 2009). But those decisions do not support the proposition that Title VII allows for Equal Protection or Free Exercise claims independent of a Title VII claim. A claim brought under Title VII is a Title VII claim. It is not a Title VII claim plus independent Equal Protection or Free Exercise claims.

Luxton also references the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-(3)(a) to support a Free Exercise claim (*id*. at 26) and appears to claim a federal Procedural Due Process claim (*id*. at 27). But Luxton's Complaint does not contain a Religious Freedom Restoration Act claim or a federal Procedural Due Process claim.

1    Luxton's response also argues "Plaintiff's constitutional claims for prospective injunctive

2    relief of reinstatement is permitted against the States and its agencies under Title VII to the same

3    extent they are under any action pursuant to 42 U.S.C. § 1983." (*Id*. at 28.)  But nowhere in

4    Luxton's Complaint is a request for injunctive relief ever made; each federal cause of action

5    asserts only "damages," which Luxton seeks in his prayer for relief.  (Dkt. No. 1 at 14–15, 22–

6    26.)  Moreover, Luxton has not sued a state official, only the Department.  Luxton therefore

7    cannot seek injunctive relief against the Department without having named a state official as a

8    defendant.  *Doe*, 131 F.3d at 839 (confirming that under the *Ex Parte Young Doctrine*, a state

9    official is a "person" for purposes of § 1983 only if sued for prospective injunctive relief;

10    otherwise, the state official maintains sovereign immunity as an arm of the state).

11    As for Luxton's request to add a new party "in his official and personal capacities to

12    allow Plaintiff to proceed on his 42 U.S.C. § 1983 claims" (Dkt. No. 38 at 30), the Court finds no

13    basis to allow Luxton to add new parties to this litigation[4] considering the stage of this litigation

14    and the resulting prejudice the new proposed party would suffer in entering the litigation at this

15    stage.

16    Finally, the Department seeks dismissal of Luxton's federal Constitution Takings Clause

17    claim.  The Department identifies, "Plaintiff has not alleged that his loss of any 'property'

18    resulted in a taking for a 'public use.'"  (Dkt. No. 26 at 20) (citing *Kir v. Hockenberry*, No. 1:14-

19    cv-713, 2016 WL 374433, at *4 (S.D. Ohio Feb. 1, 2016).  Luxton's response offers no facts or

20

---

21    [4] Luxton cites *Bolden-Hardge*, 63 F.4th 1215, 1221 (9th Cir. 2023) for the proposition that the
      "Ninth Circuit has been extremely forgiving in allowing a plaintiff asserting a 42 U.S.C. § 1983
22    claim to switch remedies and substitute parties."  (*Id*.)  To put it mildly, Luxton use of *Bolden-
      Hardge* for such proposition is overreaching as *Bolden-Hardge* involved a motion to dismiss for
23    lack of subject matter jurisdiction and for failure to state a claim.  *Id*. at 1220.  *Bolden-Hardge*
      did not involve an attempt to add new parties after completion of discovery at the dispositive
24    motion stage of litigation.

1   law supporting the conclusion that his property was taken for a public use.  Nor does he argue

2   against the dismissal of his Takings Clause claim.

3       At bottom, Luxton federal constitutional claims asserted in his Complaint are barred by

4   sovereign immunity because the Department is not a "person" for purposes of § 1983.  Luxton's

5   federal constitutional claims are DISMISSED.

6   **B. Title VII/ADA "Perceived Disability" Claim**

7       Luxton's Complaint confusingly asserts, "Title VII of the Civil Rights Act of 1964,

8   combined with the Americans with Disability Act (ADA) prohibits discrimination in the

9   workplace based on an actual or perceived disability." (Dkt. No. 1 at 23.)  The Department

10  argues "Title VII does not govern claims related to disabilities" and that Plaintiff's "combined"

11  claim "finds no support in the law." (Dkt. No. 26 at 21.)  Plaintiff offers no response to the

12  Department's request to dismiss the perceived disability claim.  (*See* Dkt. No. 38.)  The Court is

13  unaware of any authority supporting a perceived disability claims based on a Title VII and ADA

14  combination.

15      To the extent Luxton's Complaint raises an ADA perceived disability claim, at a

16  minimum Luxton mush show "that the [Department] knew that [Luxton] had an actual

17  impairment or perceived [Luxton] to have an impairment" and that the Department discriminated

18  because of the perceived impairment.  *E.E.O.C. v. BNSF Ry. Co.*, 902 F.3d 916, 922–923 (9th

19  Cir. 2018), *as amended* (Sept. 12, 2018).  Luxton offers no facts or law supporting the

20  conclusion that COVID-19 vaccination status is a real or perceived disability for purposes of the

21  ADA.  Rather, "[s]ince 2020, courts have addressed the issue of whether COVID-19 vaccination

22  status is a 'perceived disability' when the employer's vaccine policy applies to all workers and

23  have concluded that it is not." *Strandquist v. Washington State Dep't of Soc. & Health Servs.*,

24

1    No. 3:23-CV-05071-TMC, 2024 WL 4645146, at *13 (W.D. Wash. Oct. 31, 2024),

2    *reconsideration denied,* No. 3:23-CV-05071-TMC, 2024 WL 4979859 (W.D. Wash. Dec. 4,

3    2024) (collecting cases).

4            Accordingly, Luxton's Title VII/ADA perceived disability claim is DISMISSED.

5    **C. Luxton's Title VII Disparate Treatment and Disparate Impact claims**

6            Luxton alleges Title VII disparate treatment and disparate impact claims in his briefing.

7    (Dkt. Nos. 38 at 8, 22; 31 at 4.)  But as the Department points out, the only Title VII claims

8    Luxton asserts in his Complaint are for "perceived disability" and "failure to accommodate."

9    (Dkt. Nos. 49 at 3; 34 at 8; *see also* 1 at 23–24.)  Luxton's attempt to argue previously unasserted

10   legal theories is not well received.

11           Here, the Parties had until August 21, 2023, to amend pleadings and discovery was

12   concluded on December 13, 2024.  (Dkt. No. 10.)  As the Ninth Circuit has articulated, "adding a

13   new theory of liability at the summary judgment stage would prejudice the defendant who faces

14   different burdens and defenses under [new theories] of liability."  *Coleman v. Quaker Oats Co.*,

15   232 F.3d 1271, 1292 (9th Cir. 2000).  Though Luxton's makes no formal request to amend his

16   pleadings to add these two new Title VII theories of liability (*see generally* Dkt. No. 38), the

17   Court hereby declines to allow such an amendment at this stage of the litigation.  Accordingly,

18   Luxton's late Title VII disparate treatment and disparate impact claims are not properly before

19   this Court and will not be considered.

20   **D. Title VII Failure to Accommodate Claim**

21           The Department argues Luxton's Title VII failure to accommodate claim fails as a matter

22   of law because (1) Luxton failed to establish a sincerely held religious belief, (2) removing an

23   essential function of the job is not a reasonable accommodation, and (3) the Department

24

1    established undue hardship as a matter of law.  (Dkt. No. 26 at 21–24.)  The Department further

2    argues Luxton's "failure to engage in the accommodation process is a bar to his failure to

3    accommodate claim."  (Dkt. No. 34 at 16.)

4        1.  Prima Facie Case

5        To allege a prima facie case of religious discrimination under Title VII, a plaintiff must

6    plead that "(1) a bona fide religious belief of the employee conflicted with an employment

7    policy; (2) the employee informed the employer of the conflict; and (3) the employee was

8    penalized in some way because of the conflict."  *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859

9    F.2d 610, 614 (9th Cir. 1988).  "Once an employee establishes a prima facie case of failure to

10   accommodate religion, the burden shifts to the employer to show 'either that it initiated good

11   faith efforts to accommodate reasonably the employee's religious practices or that it could not

12   reasonably accommodate the employee without undue hardship.'"  *Bolden-Hardge*, 63 F.4th

13   at1224 (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)).

14       As to Luxton's prima facie case, the Department only challenges Luxton's bona fide

15   religious belief.  It argues Luxton's religious belief is not bona fide because Luxton "does not

16   say how the use of fetal cells conflicts with his religious beliefs, rather than moral or 'conscience

17   rights'" and because Luxton has "never researched the use of fetal cells in any other medicines

18   that he uses, even though the . . . fetal cell line Plaintiff cites in his exemption request are used in

19   aspirin, Tylenol, and Ibuprofen."  (Dkt. No. 26 at 23.)

20       "The Supreme Court has, albeit in the free exercise context, cautioned against second-

21   guessing the reasonableness of an individual's assertion that a requirement burdens her religious

22   beliefs, emphasizing that a court's narrow function . . . in this context is to determine whether the

23   line drawn reflects an honest conviction."  *Bolden-Hardge*, 63 F.4th at 1223 (citing *Burwell v.*

24

*Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)) (internal quotation marks omitted). However, "[t]his principle does not mean that courts must take plaintiff['s] conclusory assertions of violations of their religious beliefs at face value." *Id.* Rather, the Court should focus its inquiry on whether the plaintiff has alleged an actual conflict. *Id.* Nonetheless, "[a] religious belief need not be consistent or rational to be protected under Title VII, and an assertion of a sincere religious belief is generally accepted." *Keene v. City and Cnty of San Francisco*, No. 22-16567, 2023 WL 3451687, *2 (9th Cir. May 15, 2023).

Here, Luxton identified in his original religious accommodation request his Catholic faith. Luxton identified he was unable to take the available COVID-19 vaccines because they used human fetal cell lines in their testing, development, or production stage. Luxton cited guidance issued by Catholic religious leaders indicating that although the Catholic Church did not forbid the taking of COVID-19 vaccines, it left to each follower to discern using their own conscience whether to take the vaccine in light of the use of fetal cell lines. *See* Ladaria, *supra* note 1; *see also* NCBC, *supra* note 1. Luxton's position on his religious beliefs does not appear to have changed since he submitted his religious accommodation request. Even though Luxton's religious belief may appear inconsistent to the Department, the Court on summary judgment is not in a position to question the sincerity of Luxton's religious beliefs.

2. Reasonable Accommodation

i. *Reassignment*

Title VII, by its very terms, "directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986). However, an employer is not obligated to "accept any accommodation, short of 'undue hardship,' proposed by an employee." *Am. Postal Workers Union, San Francisco Loc. v.*

1  *Postmaster Gen.*, 781 F.2d 772, 776 (9th Cir. 1986).  Rather, an employer need only offer an

2  accommodation that would "effectively eliminate" any conflict between the employee's

3  sincerely held religious beliefs and the employer's work requirements while "preserv[ing] the

4  affected employee's employment status."  *Id.* at 776–777; *see also We The Patriots USA, Inc. v.*

5  *Hochul*, 17 F.4th 266, 292 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), and *cert.*

6  *denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022) ("[A]n employer must offer a

7  *reasonable* accommodation that does not cause the employer an undue hardship.  Once 'any

8  reasonable accommodation is provided, the statutory inquiry ends.'").

9         Importantly, "[t]he employee has a duty to cooperate in the accommodation process."

10  *Kelly v. Cnty. of Orange*, 101 F. App'x 206, 207 (9th Cir. 2004).  "[A]n employee is required to

11  make a good faith attempt to satisfy his needs through means offered by the employer after the

12  employer takes the initial step towards accommodating the employee's conflicting religious

13  practice by suggesting a possible accommodation."  *Bartholomew v. Washington*, 725 F. Supp.

14  3d 1225, 1232 (W.D. Wash. 2024) (citing *E.E.O.C. v. AutoNation USA Corp.*, 52 F. App'x 327,

15  329 (9th Cir. 2002); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1441–1442 (9th Cir. 1993)) (cleaned

16  up).

17         In *Bartholomew*, the plaintiff failed to identify steps taken to explore possible

18  reassignment once his employer accepted his sincerely held religious beliefs.  *Id.* at 1230. "Once

19  Defendants determined Bartholomew's religious beliefs were sincerely held and prevented his

20  vaccination, the ball was in Bartholomew's court to provide their requested information to begin

21  the accommodation process."  *Id.* at 1232.  In the absence of facts identifying the plaintiff had

22  taken steps to follow his employer's accommodation process, this Court concluded, "Plaintiff's

23

24

1  refusal to provide his resume and continued insistence upon his preferred accommodation

2  doomed his . . . complaint." *Id.*

3       Here, on October 5, 2021, the Department informed Luxton how to pursue reassignment

4  within the Department.  (Dkt. No. 30-9 at 3) ("If you would like us to explore any available

5  reassignment options, you must email your Human Resource Consultant, Aschlee Drescher,

6  Aschlee.Drescher@dva.wa.gov, no later than 7 days from the date of this notice.").  Luxton

7  immediately emailed Drescher, but rather than request reassignment, Luxton requested

8  information about his exemption and accommodation denial.  (*See* Dkt. No. 37 at 20.)  Luxton

9  never submitted his resume to Drescher nor informed Drescher that he wanted to pursue

10  reassignment.  These two facts are undisputed.

11       Despite not following the procedure the Department identified for requesting

12  reassignment, Luxton states he "specifically requested to participate in the reassignment

13  process." (Dkt. No. 48 at 5.)  But the only evidence supporting this position is Luxton's

14  description of his October 5, 2021 conversation with Forbes, which is contained in Luxton's

15  declarations submitted for and against the competing motions for summary judgment.  (*See* Dkt.

16  Nos. 32 at 7; 37 at 21, 23.)  And the description of his conversation with Forbes in those

17  declarations is different in each declaration than the description he provided during his

18  deposition.  Luxton did not mention speaking with Forbes about reassignment when asked in his

19  deposition about his October 5, 2021 conversation with Forbes.  (*See* Dkt. No. 50-1 at 8.)

20  Rather, Luxton stated only that he asked Forbes if there was "anything she could do" regarding

21  his accommodation request; to which Forbes responded, "she had nothing to do with [his

22  accommodation request], and it was settled."  (*Id.*)  Then in his first declaration, Luxton stated he

23  asked Forbes what "she could do regarding []accommodation[] options, including any

24

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) AND PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 31) - 24

1   reassignment options." (Dkt. No. 32 at 7.)  While in his second declaration, Luxton stated he

2   asked "if there was anything that could be done and specifically asked her if [he] could be

3   reassigned." (Dkt. No. 37 at 21.)  Luxton relies on the description contained in the second

4   declaration as support for his position that he specifically asked Forbes to be reassigned.  (*See*

5   Dkt. No. 48 at 5) (citing statements contained in Dkt. No. 37.)

6           "Ordinarily . . . when a declaration directly contradicts prior deposition testimony, the

7   deposition testimony controls and the declaration must be disregarded."  *In re ConAgra Foods,*

8   *Inc.*, 302 F.R.D. 537, 563 n.95 (C.D. Cal. 2014); *see also Kennedy v. Allied Mut. Ins. Co.*, 952

9   F.2d 262, 266 (9th Cir. 1991) ("The General rule in the Ninth Circuit is that a party cannot create

10  an issue of fact by an affidavit contradicting his prior deposition testimony").  A subsequent

11  declaration can be considered if it merely elaborates upon, explains, or clarifies prior testimony;

12  if minor inconsistencies result from an honest mistake, or if there is newly discovered evidence.

13  *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

14          While one might conclude Luxton's first declaration merely elaborated or clarified his

15  deposition testimony—by identifying that he asked Forbes if there was anything she could do

16  regarding his accommodation options, including reassignment options—the same cannot be said

17  of the statements contained in the second declaration.  Luxton affirmatively states in the second

18  declaration that he specifically asked Forbes to be reassigned.  This conflicts with his prior

19  testimony regarding his conversation with Forbes.[5]  Accordingly, the Court finds Luxton's

20  deposition testimony controls and disregards Luxton's description of his conversation with

21  Forbes in his second declaration.

22

23  ---

    [5] Note that the second declaration was filed after the Department identified in its motion for
24  summary judgment that Luxton did not request reassignment.

1    Luxton also argues that "reassignment was pursued, but was unavailable to Plaintiff."

2    (Dkt. No. 48 at 6.)  This position is based on a statement Luxton asserts Drescher made while

3    testifying at an unemployment hearing in September 2022 and in response to Luxton's complaint

4    filed with Equal Employment Opportunity Commission (EEOC).  (*Id*. at 6–7; *see also* Dkt. No.

5    37 at 23.)  However, Luxton does not provide a copy of the unemployment hearing transcript.

6    Therefore, the Court lacks any understanding of the context in which Drescher offered testimony

7    and whether her testimony related to the Department's review of Luxton's accommodation

8    request in October of 2021 or whether it related to a subsequent review that occurred in response

9    to Luxton's unemployment claim.  Moreover, even assuming the Department internally

10    discussed possible reassignment, Luxton never sought reassignment as instructed.

11    Thus, the undisputed facts are as follows: the Department told Luxton how to submit a

12    reassignment request; Luxton did not do so and instead asked Forbes what she could do

13    regarding possible accommodations; Forbes told Luxton she was not the decision maker

14    regarding his accommodation request[6]; Luxton did not discuss any reassignment request with

15    any other person at the Department; and Luxton never submitted a reassignment request as

16    instructed by the Department.

17    Based on these undisputed facts, and as this Court held in *Bartholomew*, "Plaintiff's

18    refusal to provide his resume and continued insistence upon his preferred accommodation

19    doomed his . . . complaint."  725 F. Supp. 3d at 1232.  Luxton's Title VII reasonable

---

[6] Luxton was consistent in his deposition testimony and in his declarations that Forbes stated she could do nothing regarding his accommodation request.  (Dkt. Nos. 50-1 at 8, "She stated she had nothing to do with it"; 32 at 7, "she said she was excluded from my [religious accommodation] review"; 37 at 21, "she responded by saying she was excluded from deciding whether to grant me a religious accommodation.")

accommodation claim fails as a matter of law.  The Department's motion for summary judgment as to this claim is GRANTED.[7]

### ii.    Undue Hardship

Even if Luxton had requested reassignment, the Department established that accommodating Luxton would have been an undue hardship as a matter of law.

"What constitutes undue hardship must be determined within the particular factual context of each case." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999); *see also Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (describing undue hardship as a "context-specific standard").  "Courts consider economic and non-economic costs, including safety and health risks." *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *8 (W.D. Wash. Nov. 13, 2024) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship.").  The spread of COVID-19 can create "valid health and safety concerns that can constitute an undue hardship." *Strandquist*, 2024 WL 4645146, at *11 (citing *Doe v. San Diego Unified School District*, 19 F.4th 1173, 1180 (9th Cir. 2021)).  "Numerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023) (collecting cases).  Also, "[c]ourts within the Ninth Circuit recognize that it is appropriate to confine the [undue hardship] analysis

---

[7] Additionally, Luxton requests "partial summary judgment as to his prima facie case regarding his Title VII disparate treatment claims because there is no genuine material fact issues under the burden shifting framework for a prima facie [sic] for failing to reasonable [sic] accommodate his sincerely held religious beliefs."  (Dkt. No. 31 at 4.)  Having granted Defendant summary judgment on Luxton's Title VII claim for failure to accommodate and having concluded Plaintiff never asserted a Title VII disparate treatment claims, *supra*, the Court DENIES Luxton's request as MOOT.

1    to the information available to the employer when it made its undue hardship decision." *Efimoff*,

2    2024 WL 4765161, at *9 (collecting cases) (internal quotation marks omitted).  "This approach

3    comports with how courts analyze whether a plaintiff has alleged a prima facie case against an

4    employer—by assessing information the plaintiff provided to the employer and, thus, the

5    information of which the employer had notice."  *MacDonald v. Oregon Health & Sci. Univ.*, No.

6    3:22-CV-01942-IM, 2024 WL 33116199, *7 (D. Or. July 5, 2024).  Further:

7         [t]his approach also comports with common sense.  To judge an employer's undue
         hardship decision based on knowledge and information developed after the fact
8         would hold that employer to an impossible standard.  Courts would be tasked with
         judging an employer's decision with the benefit of hindsight, irrespective of
9         factors like the consensus of reputable organizations, the evolving nature of a
         situation, and the type and quality of information available at the time.  Title VII
10        does not require employers to predict the future.

11   *Id.*

12        Here, the duties and responsibilities of the Director of Counseling and Wellness

13   Programs (Luxton's position) are contained in the Position Description Luxton reviewed and

14   signed on September 2, 2021.  (Dkt. No. 30-5.)  Luxton is correct that the Position Description

15   described the work as: "Office Setting.  Up to 100% authorized based on WDVA mission

16   requirements."  (*Id.* at 6.)  But immediately before and after are other statements identifying the

17   Director must possess the "ability to travel throughout the State" and that the position requires

18   frequent travel within the state.  (*Id.*)  The main body of the Position Description further states

19   that the actual duties include direct responsibility for administering all provider contracts, which

20   requires conducting provider site visits to ensure compliance with Department requirements and

21   provider performance.  (*Id.* at 3–5.)

22        The Department also described the services it provides to veterans and the type of the

23   contracted services Luxton was responsible for managing.  (Dkt. No. 30 at 2–5.)  Furthermore,

24

1    the Department states it required its contractors to follow all COVID related protocols and that it

2    "could not confirm that these protocols were always followed in the non-Department locations"

3    (e.g. contractor locations).  (*Id*. at 30.)  Additionally, the Department identified specific provider

4    locations where remote communications were impossible and circumstances involving grief or

5    trauma where remote communications ought not to be employed.  (*Id*. at 15; Dkt. No. 28 at 12–

6    14.)  Notwithstanding the information contained in the Position Description and the specific

7    examples requiring travel and personal interaction, Luxton argues "personal interaction with []

8    contractor[s] may be desirable, but in the face of a pandemic, it is not absolutely necessary" and

9    that travel was not an "essential function" because he could meet with people remotely.  (Dkt.

10    No. 37 at 12–13.)  Taken as a whole, a rational trier of fact could only find that Luxton should

11    not have expected to perform his duties "100% remotely"; that is, travel and in-person

12    interaction with contracted providers, veterans, and their families were vital components of

13    Luxton's employment.

14        The Department also identified that during the relevant period it employed the use of

15    personal protective equipment, masks, social distancing, testing, and infection control practices.

16    (Dkt. No. 28 at 3–4; 30 at 8–7.)  Despite these measures, as of October 7, 2021, 189 staff had

17    tested positive for COVID-19 and by end of October 2021, 35 veterans in Department facilities

18    had died after contracting COVID-19.  (Dkt. No. 30 at 7–8.)  Based on these undisputed facts, a

19    rational trier of fact could only conclude the Department reasonably believed Luxton's

20    unvaccinated status presented a significant risk to the vulnerable individuals the Department

21    served and, therefore, that allowing Luxton to maintain his position caused an undue hardship.

22        Although Luxton argues the Department "has produced no evidence of any monetary

23    burden incurred had it temporarily allowed Plaintiff to work remotely for sixty (60) days and

24

reassess" (Dkt. No. 38 at 20), "[c]ourts consider economic and non-economic costs, including safety and health risks." *Efimoff*, 2024 WL 4765161, at *8. Thus, where non-economic factors—health risks in this case—drive the undue hardship analysis, evidence of monetary burdens is not required.

Luxton also produced two expert witnesses to challenge the Department's position on undue hardship. But these witnesses fail to raise genuine issues of material fact. First Brock's report references SHRM guidance on processing religious accommodation requests but fails to identify whether such guidance was published as of October 2021 and whether the Department was aware of or had access to such guidance. Accordingly, there is no basis to conclude such guidance applied to the Department's decision in October 2021.

Brock also testified she did not review "in detail" the Position Description in formulating her opinions. (Dkt. No. 25-6 at 8) She states that: he understood Luxton held an administrative role but she did not know what his essential functions were (*id*.); she did not review any information about the remote meeting capabilities of the various locations that Luxton was required to engage with (*id*.); she was not aware of the specific interactions Luxton was required to have with veterans and their families (*id*. at 9–11); she did not take into consideration the specific population Luxton was required to serve (*id*. at 12); and she did not discuss with Luxton his job responsibilities to understand what he understood about remote work (*id*. at 16). Thus, Brock offered opinions about undue hardship, or lack thereof, without understanding Luxton's duties or the limitations remote communications would impose on performing his duties.

In short, Brock's opinions are neither reliable nor relevant because it is unclear whether SHRM's guidance standards applied to the Department in October 2021 and because Brock lacked foundation to opine on hardship where she lacked knowledge of Luxton's employment

1  responsibilities and duties.  *See* Fed. R. Evid 702 (requiring expert testimony to be the product of

2  reliable principles and methods, as well as based on sufficient facts or data).

3     Risch's opinions are formulated based on data obtained after Luxton was separated from

4  the Department.  While Risch's report states all the evidence upon which he bases his opinions

5  "was available in 2021" (Dkt. No. 36-1 at 15), the majority of the data and studies he cites to

6  were published after October of 2021.  For example, Risch relies on "meta-analysis of studies of

7  reinfection risks" that was published on December 13, 2021 and a later "meta-analysis of

8  reinfection studies" published in 2023.  (*See id.* at 5.)  And although some of the studies upon

9  which the meta-analyses were performed did occur before October 2021, it is clear Risch relies

10  on the later meta-analyses to reach his conclusions.

11     Risch also relies on vaccine breakthrough infection data that includes data from October,

12  November, and December 2021 to calculate a 4.3% vaccine breakthrough infection rate.  (*Id.* at

13  8–9.)  He then applies his calculated post-October 5, 2021 breakthrough infection rate to

14  Department vaccination data published on January 12, 2022 to reach his conclusions about risks

15  associated with vaccinated employees.  (*Id.* at 12–13.)  However, to judge the Department's

16  undue hardship decision based on knowledge and information developed after the fact would

17  hold the Department to an impossible standard by applying the benefit of hindsight to the

18  Department's decision.  *See MacDonald*, 2024 WL 33116199, *7.

19     Even taking Risch's opinions at face value, Risch never opines that Luxton's

20  unvaccinated status posed no risk to the vulnerable population Luxton was required to interact

21  with.  And Risch only concludes that the total infection load of 35 hypothetical Department

22  employees—representing 4.23% of total employees Risch calculated would suffer a

23  breakthrough infection—would be greater than the total infection load of 10 unvaccinated

24

1   employees, representing 1.2% of the Department's total employees who decided against

2   vaccination.  (Dkt. No. 35-1 at 12.)  From this, Risch opined that unvaccinated employees did

3   not cause any greater risk to the Department's client base because of the aggregate infection load

4   of 35 employees versus that of 10 employees.  But Risch provides no information about the

5   specific job duties and functions the 35 hypothetical employees—a necessary predicate to

6   comparing them with the duties, functions, and the interactions Luxton would have.  Risch

7   therefore does not identify the specific infection risk Luxton posed to the Department's

8   vulnerable client base relative to the infection risk of any of the individual hypothetical

9   vaccinated employees.

10         Moreover, accepting a breakthrough infection rate of 4.3% logically means that 95.7% of

11   the Department's vaccinated employees would not have experienced a breakthrough infection.

12   Thus, when Risch opines that "the risk of infection load as a totality among vaccinated

13   employees and among unvaccinated employees applies equally at the in-person interaction level,

14   as probabilities" (*id*. at 13), it means individual vaccinated employee would have a 95.7%

15   probability of *not* suffering a breakthrough infection whereas, presumably, an unvaccinated

16   employee would have a 100% probability of suffering an infection.  In other words, the

17   probability of infection from a vaccinated versus unvaccinated employee assigned Luxton's

18   duties was far greater for an unvaccinated employee.

19         Accordingly, Risch's opinions are not relevant as they are not based on data that was

20   accessible to the Department on October 5, 2021; because they are based on aggregate employee

21   data that does not distinguish between the duties and responsibilities of hypothetical employees

22   as compared to those of Luxton; and because, when applied at the individual level, Risch's

23

24

calculations show that an individual vaccinated employee carried a significantly lower risk of infection than an unvaccinated employee.

In sum, the Court concludes as a matter of law the Department is entitled to summary judgment on Luxton's Title VII failure to accommodate claim.

**E.  Court declines supplemental jurisdiction over Luxton's state law claims**

Having granted dismissal of Luxton's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state claims.  *See* 28 U.S.C. § 1367(c); *Jones v. Cmty. Redev. Agency*, 733 F.2d 646, 651(9th Cir. 1984) ("When federal claims are dismissed before trial . . . pendant state claims also should be dismissed.").  Accordingly, the Court DISMISSES without prejudice all remaining state law claims.

**IV  CONCLUSION**

Having considered the competing motions for summary judgment (Dkt. Nos. 26, 31), the Court hereby ORDERS:

1.  The Department's motion for summary judgment as to Luxton's federal claims is GRANTED and such claims are DISMISSED with prejudice.  As to the remaining state claims, the Court declines to exercise supplemental jurisdiction over those claims and they are DISMISSED without prejudice.

2.  Luxton's motion for partial summary judgment (Dkt. No. 31) is DENIED as MOOT.

3.  The Department's motion to strike portions of Luxton's January 31, 2025 declaration (*see* Dkt. No. 49 at 1–2) is DENIED as MOOT.

4.  The Department's motion to exclude Luxton's proffered experts (Dkt. No. 24) is DENIED as MOOT.

5.  This matter is DISMISSED.

1       Dated this 24th day of March, 2025.

2

3

4                                          David G. Estudillo
                                           United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24